IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2022

## STATE OF TENNESSEE v. COURTNEY WATKINS

**Appeal from the Criminal Court for Shelby County**
**No. 08-05482       J. Robert Carter, Jr., Judge**
_____

**No. W2022-00411-CCA-R3-CD**
_____

The petitioner, Courtney Watkins, appeals from the summary dismissal of his petition for post-conviction DNA analysis. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and KYLE A. HIXSON, JJ., joined.

Courtney Watkins, Clifton, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Joshua Corman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

In 2010, a Shelby County jury convicted the petitioner of one count of especially aggravated robbery, and the trial court subsequently sentenced him to twenty-three years in confinement. *State v. Courtney Watkins*, No. W2010-01851-CCA-R3-CD, 2011 WL 4529615, at *1 (Tenn. Crim. App. Sept. 30, 2011), *perm. app. denied* (Tenn. Feb. 15, 2012). On direct appeal, this Court affirmed the petitioner's convictions, and the Tennessee Supreme Court denied permission to appeal. *Id.* The underlying facts of the case were summarized by this Court on direct appeal as follows:

On the afternoon of February 25, 2008, the victim, Kelvin McDonald, was driving his white Lincoln Town Car to Best Buy. On his way, he encountered the [petitioner], Courtney Watkins, whom he had met while the two were incarcerated together in the Memphis jail in 2007. The [petitioner] was seeking a ride to his cousin's residence at the Wingood Apartments, and the victim offered to take him there after he finished a few errands. The victim did not know the [petitioner] by name, only by his nickname, "Shorty Fat."

During the course of the afternoon, they stopped at a market for some gas, and the victim bought the [petitioner] some food and drinks. In the [petitioner's] presence, the victim paid for his purchases with a $100 bill. They also discussed the [petitioner's] need for a steady job. The victim told him that he was working as a truck driver and gave the [petitioner] information about how to obtain his commercial driver's license. They also stopped at the victim's cousin's house because he had been having car trouble and had requested the victim's assistance. While at the victim's cousin's house, the victim and the [petitioner] encountered a man named George Gates, who had also been incarcerated with them.

When they arrived at the Wingood Apartments, the [petitioner] instructed the victim to drive around to the back to his cousin's apartment. The men encountered a group of Hispanic individuals, and the [petitioner] spoke to them in Spanish. After the [petitioner] spoke with them, they all left the area. The [petitioner] returned to the victim's car and told the victim that his cousin was not home. As the victim turned the car around to leave the apartment complex, the [petitioner] pulled out a gun and said, "Give me your money." The victim initially thought he was joking because he could not imagine the [petitioner] doing this to him after he had helped him that afternoon. He told the [petitioner] to put his gun away and stop playing. The [petitioner] assured him that he was serious, cocked the gun, and twice fired. Fortunately, the gun misfired both times. After that, he hit the victim in the head with the gun. The victim kept driving, trying to get to a place where he could summon help. The [petitioner] hit him in the head with the gun a second time while the victim struggled to get his wallet out of his pants. The [petitioner] told him that he was not moving fast enough and shot him in the head. The victim struggled with the [petitioner] until he saw a man outside at the apartment complex. The victim rolled down his window and yelled out, "Call the police. He's robbing me."

The man the victim called out to was Larrial Gill, the maintenance man for the Wingood Apartments. While Gill was unloading some equipment at the apartment complex on the afternoon of February 28, he heard a man call out from a white Lincoln, "Call the police. I'm being robbed." He could see two African-American men in the front seat but could not identify either. Gill did not respond to the victim's call for help; instead, he went about his business unloading the equipment. After the car was out of sight, he heard two gunshots. Gill again did nothing in response but went into an apartment in which he was working.

The victim's car subsequently struck a dumpster at the apartment complex. The victim struggled to get out of the car, injuring his knee, but the [petitioner] held on to him. When the [petitioner] finally got out of the car, he took the victim's leather jacket and the victim's cellular phone car charger. The [petitioner] then got back into the car, shot the victim again in the head, and left.

Memphis Patrol Officer Lakeisha Ross responded to the scene. When she arrived, the victim was already in the back of an ambulance, but he was alert and very excited. He told Officer Ross what had happened and that a man with whom he had been incarcerated had robbed and shot him. He explained how the [petitioner] had come to be in his car that afternoon and how he knew him from their time together while incarcerated. The victim was then taken to a hospital, where he spent a week recovering from his wounds.

Several officers processed the crime scene. Officer Sam Blue took photographs of the victim's Lincoln and collected evidence from the car. He took a number of photographs showing blood on the outside of the driver's side of the car and on the pavement below. Memphis Police Officer Stacy Milligan also photographed the victim's car and areas where fluid samples were identified.

On the same day as the robbery and shooting, Memphis Police Officer Myron Fair interviewed the victim at the hospital. Though the victim was mad and upset, he was clear-minded and recounted to Officer Fair the story of how he had given the [petitioner] a ride and how he knew him from jail. He also told Officer Fair about their afternoon together, running errands and ending up at the Wingood Apartments. He explained how the [petitioner] had pulled a gun on him, demanding his money, and the struggle over the gun and subsequent shots to his head. The victim described his assailant as

being approximately five feet, nine inches tall and weighing 210 pounds. Officer Fair photographed the victim's injuries.

After his conversation with the victim, Officer Fair learned that the [petitioner's] first name was Courtney and pulled jail records from the floor and pod on which the victim was incarcerated. As a result, Officer Fair located the [petitioner's] name and photograph. Officer Fair then compiled a photographic line-up and presented that line-up to the victim approximately one week after the shooting, after he had been discharged from the hospital. The victim identified the [petitioner] as his assailant.

Shelby County Sheriff's Sergeant Michaele Byers is the record keeper for the Jail Division. She confirmed at trial that the victim, the [petitioner], and George Gates had all been incarcerated together on the same floor and in the same pod from March 28, 2007, to April 16, 2007, when the [petitioner] was released.

The defense at trial was that the [petitioner] was not the assailant. To that end, Vander Moore testified that on February 25, 2008, the [petitioner] was helping him move from his residence on Fields Road to a new residence on Gilleas Road from about 10:30 or 11:00 a.m. until shortly before 3:00 p.m., when the [petitioner] left to pick up his mother at her job downtown. Moore explained that he is employed by the City of Memphis at the Whitehaven Golf Club but that he took February 25 and 26 off to move. However, Mary Hilliard, the keeper of records from Memphis Light, Gas, and Water, presented records showing that the utilities were disconnected at Moore's Fields Road residence on February 21, 2008, and also connected that same day at his new Gilleas Road residence. Sandra Allen, an employee of the City of Memphis Golf Department, testified that Moore worked for five hours on the date of the robbery and shooting, but that he did not work on either February 20 or 21.

Charlotte Watkins, the [petitioner's] mother, testified that her son picked her up from her place of employment at 3:30 p.m. on February 25, 2008, though she had previously told a state's investigator that she did not know where the [petitioner] was or what he was doing on February 25, 2008.

*Id.* at *1-*3.

In October of 2012, the petitioner filed a pro se petition alleging various grounds for post-conviction relief, including the ineffective assistance of counsel. The post-

- 4 -

conviction court denied the petitioner's petition, and this Court affirmed. *Courtney Watkins v. State*, No. W2013-02046-CCA-R3-PC, 2014 WL 4244025, at *1 (Tenn. Crim. App. Aug. 27, 2014) (no perm. app. filed).

In December of 2020, the petitioner filed a petition for post-conviction relief requesting DNA analysis pursuant to Tennessee Code Annotated section 40-30-304. Specifically, the petitioner sought testing of blood and fluid samples photographed by police officers on the interior and exterior of the victim's car. The petitioner argued that "had this evidence been tested and presented to the jury, a reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis."

On January 25, 2022, the post-conviction court entered an order summarily dismissing the petitioner's petition. The court first noted that especially aggravated robbery is not among the class of offenses to which the Post-Conviction DNA Analysis Act applies and reviewed the petitioner's request "for the 'discretionary' application of the Act." The court found that there was no reason to believe the blood and fluid samples would "lead to a reasonable probability that the petitioner would not have been prosecuted or convicted." The court found that "[u]nlike certain evidence linked to the perpetrator of a crime, these stains (even if they still exist) would not prove exculpatory no matter who was the source of them." This appeal followed.

### *Analysis*

On appeal, the petitioner contends the post-conviction court erred in dismissing his petition for post-conviction DNA analysis. Specifically, the petitioner argues that had this DNA evidence been tested and presented to the jury, a "reasonable probability" exists that the petitioner would not have been convicted. The State contends that the post-conviction court properly dismissed the petition.

The Post-Conviction DNA Analysis Act of 2001 provides that

> a person convicted of and sentenced for the commission of first degree murder, second degree murder, aggravated rape, rape, aggravated sexual battery or rape of a child, the attempted commission of any of these offenses, any lesser included offense of any of these offenses, *or, at the direction of the trial judge, any other offense*, may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

- 5 -

Tenn. Code Ann. § 40-30-303 (emphasis added). A post-conviction court is obligated to order DNA analysis when a petitioner has met each of the following four requirements:

(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

(2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-304. In all other instances, the court *may* order DNA testing provided that the last of the three factors exist and "[a] reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to judgment of conviction." Tenn. Code Ann. § 40-30-305(1). The post-conviction court is afforded considerable discretion in its decision regarding whether to grant a petitioner relief under the Post-Conviction DNA Analysis Act, and this Court will not reverse the post-conviction court's judgment unless it is unsupported by substantial evidence. *See Tracy Lebron Vick v. State*, No. E2017-01333-CCA-R3-PC, 2018 WL 1603049, at *2 (Tenn. Crim. App. Apr. 2, 2018), *perm. app. denied* (Tenn. Aug. 8, 2018) (citations omitted) .

The post-conviction court noted that especially aggravated robbery was not one of the enumerated convictions for which a petitioner may seek relief pursuant to Tennessee Code Annotated section 40-30-303. The post-conviction court found that consideration of the petitioner's petition was discretionary, and the court exercised its discretion in considering the merits of the petition. *See* Tenn. Code Ann. § 40-30-303 (listing the convicted offenses for which a petitioner may file a petition seeking DNA analysis, including "at the direction of the trial judge, any other offense"). The State does not challenge this ruling on appeal.

We, nevertheless, conclude that the petitioner has failed to demonstrate a "reasonable probability" that he "would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis" or that "analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to judgment of conviction." Tenn. Code Ann. §§ 40-30-304(1); 40-30-305(1). The jury heard detailed testimony from the victim identifying the petitioner as the perpetrator. The victim knew the petitioner and spent a considerable amount of time with the petitioner prior to the especially aggravated robbery. Moreover, the State presented evidence to discredit petitioner's alleged alibi. Excluding the petitioner as the source of the DNA on the blood or other fluids would not have diminished the strength of the convicting evidence, as there was nothing to suggest that only the perpetrator would leave blood or fluids at the scene. Rather, the evidence presented at trial established that the victim, and not the perpetrator, was injured during the course of the especially aggravated robbery. Accordingly, the post-conviction court properly dismissed the petition, and the petitioner is not entitled to relief.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the summary dismissal of the petition for post-conviction DNA analysis.

_____
J. ROSS DYER, JUDGE